[Cite as *Siferd v. Siferd*, 2017-Ohio-8624.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

HEATHER M. SIFERD,

    PLAINTIFF-APPELLEE,

        v.

RONALD L. SIFERD,

    DEFENDANT-APPELLANT.

CASE NO. 5-17-04

O P I N I O N

**Appeal from Hancock County Common Pleas Court
Domestic Relations Division
Trial Court No. 2015-DR-249**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:  November 20, 2017**

APPEARANCES:

    *Howard A. Elliot and Jeffrey Whitman* **for Appellant**

    *Garth W. Brown* **for Appellee**

**WILLAMOWKSI, J.**

{¶1} Defendant-appellant Ronald L. Siferd ("Ronald") appeals the judgment of the Domestic Relations Division of the Hancock County Court of Common Pleas. In this appeal, Ronald alleges that the trial court erred by (1) adopting a shared parenting plan without a specified parenting schedule; (2) imputing a level of personal income to him that did not accurately represent his potential income; (3) imputing a level of income to the plaintiff-appellee for the purposes of child support that does not reflect her most recent earnings; (4) allowing a deviation in child support from the statutory schedule for the plaintiff-appellee; (5) adopting an inequitable division of the marital debts and assets; (6) awarding the student loan debt of the plaintiff-appellee to Ronald; (7) awarding spousal support to the plaintiff-appellee of an excessive amount and duration; and (8) entering an interim order that automatically renewed in violation of Civ.R. 53(D)(4)(e)(ii). For the reasons set forth below, the judgment of the lower court is reversed in part and affirmed in part.

*Facts and Procedural History*

{¶2} Ronald and Heather M. Siferd ("Heather") were married on October 3, 1992, in Findlay, Ohio. Tr. 11, 178. In February of 1993, Ronald started a business called the Siferd Plumbing, Heating, Air Conditioning Service ("Siferd Plumbing"). Tr. 97. Doc. 63. Heather worked consistently at the company until 1996 or 1997, though she continued to perform various tasks for the business for the duration of

the marriage. Tr. 97. Siferd Plumbing has been located on a property that is adjacent to Ronald and Heather's marital residence. Ex. PP. A portion of this property is rented to a trucking company for $1,200.00 per month. Tr. 225-226. The rental proceeds go directly to Siferd Plumbing. Tr. 102. Both the residential and commercial sides of this property are mortgaged. Ex. 15, 16, 17, 18. In addition to Siferd Plumbing, Ron and Heather also own a 51% share of Impulse Headware, LLC but do not operate this entity and have not invested money in this enterprise in roughly three and a half years. Tr. 100, 107. Doc. 99. For a time, Ron also operated a business called Cozy Home Builders, but he has not operated under this name or derived any income through this operation since 2008. Tr. 102. Doc. 99.

{¶3} In February of 2011, Heather moved to California with her two daughters to help them pursue opportunities in the fields of modeling and acting. Tr. 16. During this time, Ronald remained in Ohio but paid for all of the living expenses incurred by Heather and their daughters. Tr. 16. She returned to Ohio in April of 2013 with her two daughters and took up residence with Ronald in the marital home. Tr. 16. In May of 2015, Heather completed a one-year long massage therapy program at Blanchard Valley Academy. Tr. 27. Ex. CC. Following her completion of this program, she took the state certification test for massage therapy but did not pass the examination. Tr. 28. By the time of the divorce hearing, Heather had not retaken the state certification examination. Tr. 28. Aside from completing this program, Heather does not have any additional vocational training. Tr. 28. She

currently has $10,800.00 in student loans from this program and was three months behind on her payments on this loan at the time of the divorce hearing. Ex. CC. Tr. 32.

{¶4} In the summer of 2015, an employee at Siferd died in a work related incident. Tr.98. As the result of this incident, the Occupational Safety and Health Administration ("OSHA") levied a fine of $15,750.00 on Siferd Plumbing. Tr. 248. At the time of the divorce hearing, no wrongful death suit had been filed by the family of the deceased. Tr. 270. In addition to this fine, Ron and Heather jointly owe the Internal Revenue Service $28,698.74 in personal income taxes. Tr. 62-63, 158, 248. Doc. 99. In 2015, Heather and Ronald filed for personal bankruptcy. Tr. 11-12. They were discharged in bankruptcy in September of 2015. Doc. 99. During this time period, Ronald gambled between $23,000.00 and $24,000.00 in various casinos. Ronald testified that this resulted in a net loss of $2,000.00 in 2015. Tr. 192, 217, 284. In 2015, Heather won $5,000.00 in a gambling pool. Tr. 47. She used this money to pay off the debt on her car, which is a 2003 Lexus. Tr. 125.

{¶5} On August 3, 2015, Heather filed for a divorce in the Hancock County Court of Common Pleas. Doc. 1. The divorce complaint stated that one of Heather and Ronald's two children was a minor at the time that this action was filed. Doc. 1, 14. In October of 2015, Heather moved from the marital residence into a house that her parents purchased for her use. Doc. 63, 68. Her parents put a $23,000.00 down payment on this house and rented this property to Heather for $900.00 a

month, though Heather was behind on her rental payments at the time of the divorce proceeding. Her parents intended to transfer the house to her once she was able to obtain a loan from a financial institution. Tr. 175. At this point, Heather owes her parents over $30,000.00[1] for various expenses that her parents have covered. Tr. 167, 170.

{¶6} On November 25, 2015, the court issued a temporary order that required Ronald to pay for all of the expenses of the minor child and to pay Heather $750.00 per month in spousal support. Doc. 40. Heather had been accustomed to receiving $800.00 per week from Ronald to cover living expenses for the last fifteen years of her marriage. Tr. 130. This practice ended in May of 2015 as Ronald began to spend the money on expenses himself. Tr. 130. Heather reported to the magistrate that the conclusion of this practice combined with moving out of the marital residence has changed her lifestyle. Doc. 99. At the time of the divorce proceeding, Ronald was current on his temporary spousal support obligations. Tr. 81.

{¶7} In between filing for a divorce and the divorce hearing, Heather had several jobs that she used to supplement the income she had from spousal support. From October of 2015 to December of 2015, she was employed as a cashier at Gordon Food Service, making $9.00 an hour. Tr. 30. She left Gordon Food Service to work a temporary job at Best Buy, which lasted for one month and paid $12.00

---

[1] This figure includes the $23,000 down payment on the house in which Heather lives. Tr. 175.

an hour. Tr. 30. On January 26, 2016, she began working for Roki America ("Roki") where she was a scheduler for the plant and earned $16.82 an hour. Tr. 28-29. Heather stopped working at this job on February 25, 2016, because she "decided it just wasn't working." Tr. 29. By the time of the divorce hearing, Heather had not found another job and did not have any job interviews scheduled. Tr. 31.

{¶8} The divorce proceeding was held on April 19, 2016. Tr. 1. Heather testified that she would still need financial assistance from Ronald even if she had continued to work at Roki. Tr. 49-50. She also stated that she does not have credit cards or a savings account, leaving her with little cash on hand and struggling to pay her bills. Tr. 49. As part of her testimony, she also detailed her monthly expenses for the court from before and after her separation with Ronald. Doc. 99. When Ronald testified, he addressed the financial situation of Siferd Plumbing at length. He listed the various liabilities that currently burden his business. These business debts amount to $403,223.58. Tr. 267. Doc. 99. On the basis of these numbers, Ronald estimated that his business had a negative equity of roughly $20,000.00. Tr. 247. Doc. 99. He stated that he hoped his business could turn a profit in the future but was unsure of the potential his company had to be profitable in the future. Ronald also stated that he had personal debts of $361,894.50. Tr. 267. According to his testimony, he is "$208,000 upside down" when his assets are subtracted from his liabilities. Tr. 282.

{¶9} On May 9, 2016, the magistrate issued her findings and recommendations. Doc. 99. On July 11, 2016, Ronald filed objections to the magistrate's findings and recommendations. Doc. 115. These objections were overruled by the trial court on December 21, 2016. Doc. 132. The divorce decree was entered on December 30, 2016. Doc. 134. Under the judgment entry, Ronald retained all of the residential and commercial real estate that the couple had owned together. Doc. 134. Ronald also retained all of his interests in Siferd Plumbing and Impulse Headware. Doc. 134. The trial court also made Ronald solely responsible for all of the debts of the parties, which amount to $735,848.22. Doc. 134. This includes the $10,800.00 in student loans that Heather borrowed for her education. Doc. 134.

{¶10} The trial court then decided the issues of spousal support and child support. The magistrate found that Ronald's gross income was $96,113.00 for child support purposes. Doc. 99. The magistrate then determined that Heather's potential income was $9.00 an hour or roughly $18,720.00 a year. Doc. 99. On the basis of these figures, the magistrate determined that Heather should pay $300.00 per month for the support their minor child. Doc. 99. The magistrate deviated the amount of Heather's child support from the statutory schedule, which stated that Heather should pay $389.50 per month. Doc. 99. In so doing, the magistrate also found that spousal support was appropriate and ordered that Ronald pay Heather $2,000.00 a month in spousal support. Doc. 99. To account for the $300.00 that Heather owed

Ronald each month for child support, the amount of monthly spousal support was reduced to $1,700.00 per month for the time in between the divorce decree and June of 2017, which is when their minor child turned the age of majority. Doc. 99. However, beginning in July of 2017 and continuing for the next sixty months, Heather was to receive $2,000.00 per month from Ronald in spousal support. Doc. 99. The trial court adopted these findings and recommendations in its divorce decree. Doc. 134.

{¶11} Ronald filed notice of appeal on January 27, 2016. Doc. 143. On appeal, Ronald raises eight assignments of error:

### First Assignment of Error

**In the decision herein, the Trial Court abused its discretion by adopting the shared parenting plan submitted herein, where the shared parenting plan other than holidays, summer vacation, and days of special meaning does not specify the times for each parent to parent the child.**

### Second Assignment of Error

**The Trial Court abused its discretion in imputing income for child support purposes concerning the Defendant/Appellant in that income was attributed to the Defendant/Appellant not based upon the evidence before the Court, and the attribution of income which was not upon statutory guidelines for interpretation of a parent's income.**

### Third Assignment of Error

**The Trial Court abused its discretion in calculations for child support purposes regarding the Plaintiff/Appellee's income in that although correctly finding that the Plaintiff/Appellee was voluntarily unemployed because the Plaintiff/Appellee had**

**employment that she quit because the workload increased, the Magistrate imputed income to her at a rate substantially less than the employment that the Plaintiff/Appellee voluntarily left.**

### Fourth Assignment of Error

**The Trial Court abused its discretion in computing the deviation in the child support calculation and obligation of the Defendant/Appellant, the same not being the best interest of the minor child.**

### Fifth Assignment of Error

**The Trial Court abused its discretion and failed to provide for an equitable distribution of the marital property and indebtedness, when she awarded all of the indebtedness of the parties to the Defendant/Appellant.**

### Sixth Assignment of Error

**The Trial Court abused its discretion and failed to provide for an equitable distribution of marital property and indebtedness, in ordering that the Defendant/Appellant would be responsible solely for the repayment of the student loan debt of Plaintiff/Appellee.**

### Seventh Assignment of Error

**The Trial Court abused its discretion in arriving at a spousal support obligation of the Defendant/Appellant to the Plaintiff/Appellee by improperly inputting and attributing income to the Defendant/Appellant and failure to consider the income to the Plaintiff/Appellant had she not become voluntarily unemployed in awarding spousal support of an excessive length and duration as well as an excessive amount.**

### Eighth Assignment of Error

**The Court abused its discretion when it made provisions for automatic extensions of the interim order, without the need for**

**filing any motion or other request for relief, contrary to Civil Rule 53(D)(4)(e)(ii).**

We will start our analysis by evaluating Ronald's first and second assignments of error. We will then consider his fifth and sixth assignments of error together in one analysis before considering his seventh, third, fourth and eighth assignments of error.

*First Assignment of Error*

{¶12} In his first assignment of error, Ronald argues that the trial court's decision to adopt the shared parenting plan is not consistent with the requirements of Ohio law. In particular, Ronald alleges that the trial court failed to specify a parenting schedule, which he argues violates R.C. 3109.04(G). At the time of the divorce, one of Heather and Ronald's two children was a minor. Tr. 10. However, this minor child reached the age of majority during the pendency of this appeal and is now emancipated, making the issues raised in Ronald's first assignment of error moot. Tr. 10.

> **Mootness has been described as a "doctrine of standing in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Consequently, a case is moot where a judgment is sought on a matter that when rendered does not have any practical effect upon the issues raised by the pleadings.**

(Citations omitted.) *RLJ Management Co., Inc. v. Larry Baldwin*, 3d Dist. Crawford No. 3-01-16, 2001 WL 1613014 (Dec. 18, 2001), quoting *U.S. Parole Commission*

*v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). Pursuant to the doctrine of mootness, we decline to rule on the issues raised in Ronald's first assignment of error.

*Second Assignment of Error*

{¶13} In his second assignment of error, Ronald asserts that the trial court erred in determining his gross income for child support purposes. The trial court determined his income by multiplying his monthly personal expenses by twelve and then adding the total amount that he gambled in 2015 onto that figure. He raises two main arguments against this process. First, he argues that his income is subject to fluctuations and that the trial court should have calculated his potential income by averaging his income over several years. He contends that this method would provide a more accurate figure for his gross income. Second, he asserts that the trial court should not have added the $23,000.00 he gambled in 2015 to the total of the personal expenses he reported. He argues that his gambling winnings offset some of his losses such that he only lost around $2,000.00 gambling in 2015. Since his winnings were used to finance his habit of gambling, he did not spend $23,000.00 of income from his business on gambling. Thus, he argues that adding this amount onto his personal expenses distorts his gross income. On the basis of this argument, Ronald asserts that the trial court abused its discretion in computing child support.

Legal Standard

**{¶14}** Parents have a duty to support their minor children. R.C. 3103.03(A);

R.C. 3109.05(A)(1). Revised Code Chapter 3119 governs issues of child support

in cases of divorce. *See In re Adoption of K.A.H.*, 10th Dist. Franklin No. 14AP-

831, 2015-Ohio-1971, ¶ 18. R.C. 3109.05(A)(1). Under R.C. 3119.01(C)(5),

> **"Income" means either of the following:**
>
> **(a) For a parent who is employed to full capacity, the gross income of the parent;**
>
> **(b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent.**

R.C. 3119.01(C)(5). If the trial court finds that a parent is employed to full capacity,

then the trial court must determine the gross income of that parent in accordance

with R.C. 3119.01(C)(7), which, in its relevant part, broadly defines "gross income"

as follows:

> **[T]he total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes income from salaries, wages, overtime pay, and bonuses * * *; commissions; royalties; tips; rents; dividends; severance pay; pensions; interest; trust income; annuities; social security benefits, including retirement, disability, and survivor benefits that are not means-tested; workers' compensation benefits; unemployment insurance benefits; disability insurance benefits; * * *; spousal support actually received; and all other sources of income.**

R.C. 3119.01(C)(5). *See* R.C. 3103.03.

{¶15} If the trial court determines that the parent is unemployed or underemployed, then the trial court must determine the potential income of that parent. "Potential income" is defined by R.C. 3119.01(C)(11), which reads, in its relevant part, as follows:

> **"Potential income" means both of the following for a parent who the court pursuant to a court support order, or a child support enforcement agency pursuant to an administrative child support order, determines is voluntarily unemployed or voluntarily underemployed:**
>
> **(a) Imputed income that the court or agency determines the parent would have earned if fully employed as determined from the following criteria:**
>
> **(i) The parent's prior employment experience;**
>
> **(ii) The parent's education;**
>
> **(iii) The parent's physical and mental disabilities, if any;**
>
> **(iv) The availability of employment in the geographic area in which the parent resides;**
>
> **(v) The prevailing wage and salary levels in the geographic area in which the parent resides;**
>
> **(vi) The parent's special skills and training;**
>
> **(vii) Whether there is evidence that the parent has the ability to earn the imputed income;**
>
> **(viii) The age and special needs of the child for whom child support is being calculated under this section;**
>
> **(ix) The parent's increased earning capacity because of experience;**

**(x) The parent's decreased earning capacity because of a felony conviction;**

**(xi) Any other relevant factor.**

R.C. 3119.01(C)(11)(a).

In the process of computation,

**[t]he parents' current and past income and personal earnings shall be verified by electronic means or with suitable documents, including, but not limited to, paystubs, employer statements, receipts and expense vouchers related to self-generated income, tax returns, and all supporting documentation and schedules for the tax returns.**

R.C. 3119.05(A). "When determining the gross income of a self-employed parent, the trial court is to deduct ordinary and necessary expenses from the parent's gross receipts." *Foster v. Foster*, 150 Ohio App.3d 298, 2002-Ohio-6390, 780 N.E.2d 1041, ¶ 19 (12th Dist.). "Often, income for child support purposes is not equivalent to the parent's taxable income." *Neu v. Neu*, 3d Dist. Putnam No. 12-12-11, 2013-Ohio-221, ¶ 12, quoting *Foster* at ¶ 13.

{¶16} This determination is placed within the discretion of the trial court and is reviewed on appeal under an abuse of discretion standard. *Rock v. Cabral*, 67 Ohio St.3d 108, 112, 616 N.E.2d 218, 222 (1993). "An abuse of discretion is more than an error of judgment; rather, it implies that the trial court's decision was unreasonable, arbitrary, or capricious." *Schroeder v. Niese*, 3d Dist. Putnam No. 12-16-05, 2016-Ohio-8397, ¶ 7, quoting *Heilman v. Heilman*, 3d Dist. Hardin No. 6-12-08, 2012-Ohio-5133, 2012 WL 5397596, ¶ 14. "When applying the abuse of

discretion standard of review, this court is not free merely to substitute its judgment for that of the trial court." *Kreitzer v. Anderson*, 157 Ohio App.3d 434, 2004-Ohio-3024, 811 N.E.2d 607, ¶ 16 (3d Dist.).

## Legal Analysis

**{¶17}** In this case, the trial court determined that Ronald is self-employed and was not underemployed. Thus, the trial court proceeded to calculate Ronald's gross income pursuant to R.C. 3119.01(C)(7). The record shows the process of ascertaining Ronald's gross income was complicated by several factors. First, Ronald's testimony indicated that he commingled his personal and business finances as a regular practice. Second, he provided the court with a limited amount of documentation regarding his income in prior years. Ronald provided the court with a tax return from 2014 and a financial disclosure form from 2015. Ex. 1. Doc. 27. The tax return from 2014 indicated that he had business income of $47,969.00 to report for that year. Ex. 1. The financial disclosure from 2015 stated that he had personal expenses of $8,056.00 per month in 2015. Doc. 27. Beyond the two documents he submitted, however, Ronald did not provide documentation that would verify the claims that he made during his testimony about his gross income. Third, at the hearing, Ronald presented information that differed from the financial documentation that he did provide. While the financial disclosure stated he had personal monthly expenses of $8,056.00, his testimony indicated that his personal

monthly expenses were $6,079.71.[2]  Doc. 27.  Ex. 2. Ronald also testified that he was able to afford spending $23,000.00 to $24,000.00 on gambling.  Tr. 192.

{¶18} In the process of determining Ronald's income, the magistrate noted these challenges and began with Ronald and Heather's 2014 tax return, which stated that Ronald's business income for the year was $47,969.00.  Ex. 1.  However, the magistrate determined that this figure was unlikely to represent Ronald's gross income for several reasons.  First, Ronald did not verify that the $8,076.00 depreciation deduction that he claimed was for actual cash expenditures.  Doc. 99.  Second, the monthly personal expenses of $6,079.00 per month for 2016 and $8,056.00 per month for 2015, as reported by Ronald, were inconsistent with an income of only $47,969.00.  Doc. 99.  Third, the business records that were presented showed a large number of cash withdrawals at various locations.  Tr. 203.  Doc. 99.  The defendant insisted that these were for materials purchases for his business.  Tr. 195, 198-199.  However, the defendant was not able to verify that these withdrawals were for materials purchases.  On cross examination, Ronald did admit that he withdrew funds from his business account to fund his gambling habit and to pay for various personal expenses.  Tr. 209-216.  Heather's counsel also

---

[2] The financial disclosure form documented his monthly personal expenses from 2015.  Doc. 27.  His testimony was given in 2016 and detailed his current monthly personal expenses.  Ex. 2.  Thus, these statements are not necessarily inconsistent because it is possible that his average monthly expenses were different in 2015 and 2016.  The fact that these figures vary widely, however, does complicate the process of ascertaining his gross income by showing that one set of expenses that he provided to document his monthly personal expenses was either of limited use in determining his potential income or of doubtful accuracy.

introduced bank statements for Siferd Plumbing that showed Ronald routinely withdrew large amounts of cash at various casinos. Ex. A, D, E, F, G, H.

{¶19} The magistrate concluded that Ronald's income, as reported on his 2014 tax return, did not necessarily represent the funds that he had at his disposal to pay for monthly personal expenses and for child support. Since Ronald testified that he used funds from his business accounts for personal expenses and gambling, this conclusion was supported by some evidence in the record. Thus, Ronald's assertion that the magistrate "ignored" the figures from his 2014 tax returns is baseless. Appellant's Brief, 4. The magistrate did consider these returns but, based upon the other information that was presented in evidence, found them likely to be a less useful guide in determining his gross income than his monthly personal expenses would be. Doc. 99, 134.

{¶20} To determine his gross income, the magistrate turned to Ronald's monthly personal expenses, reasoning that he apparently had the funds at his disposal to cover these expenses. The magistrate multiplied his monthly personal expenses of $6,079.00 by twelve, arriving at yearly personal expenses of $72,948.00.[3] The magistrate then reasoned that Ronald had enough funds at his disposal to spend $23,165.00 on his gambling habit and added that amount to Ronald's total annual personal expenses.

---

[3] The magistrate used the most recent figures that Ronald reported for his monthly personal expenses. Doc. 99. The magistrate did not use the figures from his 2015 financial disclosure form, which showed personal expenses of $8,056.00 per month. Doc. 27.

{¶21} Ronald argues that the sum of $23,165.00 that he spent on gambling should not have been added to the total cost of his income because this number does not account for his gambling winnings. Ronald claims that he only lost $2,000.00 gambling. However, Ronald did not present any evidence to verify this claim. Heather did present evidence that Ronald spent over $23,000.00 on gambling in one year. In drawing the conclusion that Ronald spent $23,165.00 on gambling and in adding that figure to Ronald's gross income, the trial court did not abuse its discretion as it based its decision on the evidence before it. Thus, based upon Ronald's testimony as to his spending habits, the magistrate concluded that Ronald had a gross income of at least $96,113.00 that he could use to cover the costs of his personal expenses.

{¶22} Ronald further argues that the trial court should have considered an average of several years of his annual gross income. However, the extent of the information that Ronald provided to the court was one tax return from 2014, one financial disclosure form that recorded his monthly personal expenses for 2015, and one expense report from 2016. Doc. 27. Ex. 1, 2. If Ronald wanted the magistrate to average several years of income to calculate his gross income, he should have submitted more documentation. Ronald also points to the fact that he had filed for bankruptcy in 2015 and that sales were down $100,000.00 in 2015 from his 2014 sales figures, arguing that the magistrate did not account for these factors in determining his gross income. These arguments, however, belie the fact that Ronald

did not consistently keep accurate business or personal financial records and engaged in significant commingling of his personal finances with his business finances. In response to these confusing and incomplete records, the magistrate relied on the evidence she determined to be the most accurate indicator of Ronald's gross income. In examining the record, we do not find evidence that the trial court abused its discretion in adopting the recommendations of the magistrate as to these issues. For this reason, Ronald's second assignment of error is overruled.

*Fifth and Sixth Assignments of Error*

{¶23} Ronald's fifth and sixth assignments of error both address the equity of the trial court's distribution of marital indebtedness and marital property between the parties. Since the subject of these assignments of error are so closely related, we will consider them together. In his fifth assignment of error, Ronald argues that the distribution of marital assets and debts was not equitable. In the trial court's decision, Ronald was given roughly $406,100.00 in assets and $736,028.22 of indebtedness. Heather, however, was not given any of the debts that were incurred in the course of their marriage. Ronald contends that the trial court fashioned an unequal distribution of the marital indebtedness without providing the reasons that justify this decision.

{¶24} In his sixth assignment of error, Ronald argues that the trial court erred in determining that he should be solely responsible for the student loan debt incurred by Heather. Heather borrowed $10,800 to cover the costs of attending her massage

therapy training program. Ex. CC. Ronald contends that this debt is directly connected to Heather's education and her professional development. He further argues that this debt was incurred by Heather and that no evidence was presented that Ronald was aware that she had borrowed these funds. Consequently, Ronald asserts that it was error for the trial court to consider these debts to be marital and to make this debt solely his responsibility. For these reasons, Ronald argues that the trial court's distribution of property is inequitable and requests that this Court reverse the decision of the trial court and remand this case for further consideration.

Legal Standard

**{¶25}** In awarding property to the parties to a divorce proceeding, the trial court must first determine whether property is marital or separate. R.C. 3105.171(B). The separate property is generally retained by the party who obtained the separate property. R.C. 3105.171(D). The marital property, on the other hand, is to be divided equally between the parties unless such a division would be inequitable. R.C. 3105.171(C)(1). In a case where the equal division of property would be inequitable, the trial court must "divide the marital and separate property equitably between the spouses * * *." R.C. 3105.171(B).

**{¶26}** "Although Ohio's divorce statutes do not specifically articulate debt as an element of marital and separate property, the rules concerning marital assets are usually applied to marital and separate debt as well." *Schwarck v. Schwarck*, 3d Dist. Auglaize No. 2-11-24, 2012-Ohio-3902, ¶ 20, citing *Vonderhaar–Ketron v.*

*Ketron*, 5th Dist. No. 10 CA 22, 2010–Ohio–6593, ¶ 34. "The property to be divided in a divorce proceeding includes not only the assets owned by the parties but also any debts incurred by the parties." *Forman v. Forman*, 3d Dist. Marion No. 9-13-67, 2014-Ohio-3545, ¶ 31, citing *Marrero v. Marrero*, 9th Dist. Lorain No. 02CA008057, 2002–Ohio-4862, ¶ 43.

**{¶27}** "Trial courts have 'broad discretion to determine what property division is equitable in a divorce proceeding.'" *Collins v. Collins*, 3d Dist. Marion No. 9-10-53, 2011-Ohio-2339, ¶ 28, quoting *Cherry v. Cherry*, 66 Ohio St.2d 348, 421 N.E.2d 1293 (1981), paragraph two of the syllabus. "An abuse of discretion is more than an error of judgment; rather, it implies that the trial court's decision was unreasonable, arbitrary, or capricious." *Niese*, *supra*, at ¶ 7, quoting *Heilman*, *supra*, at ¶ 14. "When applying the abuse of discretion standard of review, this court is not free merely to substitute its judgment for that of the trial court." *Kreitzer, supra,* at ¶ 16.

> **In determining whether the trial court abused its discretion, a reviewing court should not examine the valuation and division of a particular marital asset or liability in isolation. The reviewing court must, instead, view the property division under the totality of the circumstances to determine whether the property division reflects an unreasonable, arbitrary or unconscionable attitude on the part of the domestic relations court.**

(Citations omitted.) *Harris v. Harris*, 6th Dist. Lucas No. L-02-1369, 2004-Ohio-683, ¶ 19, citing *Briganti v. Briganti*, 9 Ohio St.3d 220, 222, 459 N.E.2d 896 (1984).

Legal Analysis

**{¶28}** In this case, the parties brought more liabilities than assets into this divorce proceeding. The real estate on which the marital residence and Siferd Plumbing were located formed the bulk of the marital assets. This real estate was appraised to be worth $400,000.00. Ex. KK. Ronald, however, did not have an appraisal conducted for his businesses. Tr. 247. During his testimony, he simply stated that he believed that his plumbing business had a negative equity of $20,000.00 and that he hoped he could use the business to generate income in the future. Tr. 245, 247. Heather, on the other hand, testified that she believed the Siferd Plumbing had a value that exceeded its debts and that she believed this company could generate income in the future. Tr. 103-104. Ronald did testify that the equipment that he used in his business was valued by a creditor at $6,100.00. Tr. 284.

**{¶29}** The real estate that was valued at $400,000.00, however, had secured liens placed on it for debts totaling $597,774.00. Ex. 15, 16, 17, 18. The appraisal of this property came at a cost of $500.00. Ex. II. The cost of the appraisal was a debt that was listed in the judgment entry. Doc. 134. In addition to these mortgage liens, several other debts were associated with Ronald's businesses or were incurred as part of the operation of these businesses. The business owed McDonald Supply $18,087.44, had a $15,750.00 OSHA penalty levied against it for various safety violations, and had a judgment against it in the amount of $55,728.49 in favor of

Impact Credit Union. Ex. 11, 12, 14. Ronald also owed his accounting firm, which is Bosse Financial Services, roughly $7,035.00 for services performed. Ex. 10. The invoice from Bosse Financial Services was made out to Siferd Plumbing. Ex. 10.

{¶30} In addition to these business debts, Ronald and Heather owed the Internal Revenue Service $28,698.74 in personal income taxes and the State of Ohio $789.44 in personal income taxes. Ex. 5, 13. There were also three medical bills that were outstanding at the time of the divorce proceeding. Ex. MMM, WW, XX. The first showed that $105.40 was owed to Blanchard Valley Medical Practices for services performed for Ronald and Heather's minor child. Ex. MMM. The second bill showed that $359.71 was owed to Blue Cross Blue Shield for Heather's prescription medication. Ex. XX. The third bill showed that $400.00 was owed to the Findlay Family Practice for medical examinations performed for Heather and her two children. Ex. WW. Finally, Heather had a student loan from Blanchard Valley Academy that totaled $10,800. Ex. CC. Altogether, these personal and business debts amounted to $736,028.22. Doc. 99.

{¶31} In the judgment entry, Ronald was awarded the entirety of his interests in the business enterprises, the marital residence, and the business property free and clear of any claims that Heather might otherwise have. Ronald was also awarded the real estate on which the marital residence and the business was located. These assets had a total value of roughly $406,100.00. The trial court also awarded Ronald all of the debts, which total $736,028.22. Heather was not awarded any

share of these debts. The trial court noted that Heather did owe her parents roughly $30,000.00 for living expenses and the down payment that was placed on the house in which she currently resides. Tr. 34, 167, 175. This debt was incurred after she filed for a divorce and was separated from Ronald.

{¶32} The distribution of property in the trial court's judgment entry is not equal. Ronald was given $736,028.22 of debt that was incurred during the course of the marriage and $406,100.00 of assets. Heather, on the other hand, received some personal property, a car, and no share of the debts from the marriage. Ronald argues that this unequal distribution was not equitable. We will proceed to examine the trial court's reasoning and the facts in the record to determine whether this unequal distribution of marital debts and assets was equitable as required by R.C. 3105.171(B).

{¶33} In the record, Heather agreed that Ronald should keep the real estate on which the commercial property and marital residence is located. Tr. 93. Heather also agreed that Ronald should retain the businesses and did not request any ownership interest in these entities. Since Ronald was awarded these assets in full, it was equitable for him to assume the debts that were associated with them. This real estate, valued at $400,000.00, came with mortgage debts of $597,774.00 and a $500.00 bill for the appraisal of the real estate. The business enterprises he was awarded came with debts of $96,600.93. Thus, the assets he was awarded free and

clear of any claims from Heather came with debts of $694,874.93. From the facts in the record, the equity of the award of these debts and assets to Ronald is apparent.

{¶34} The debts awarded to Ronald also included three medical bills that totaled $865.11. The temporary order that was issued by the trial court on November 5, 2011, gave Ronald responsibility for maintaining health insurance for Heather and their minor child. Doc. 40. While this case was pending, Heather's health insurance lapsed. Tr. 51-52. Since Ronald was responsible for maintaining healthcare coverage, the costs associated with his failure to do so equitably belong with him. Ex. MMM. Similarly, the bills for their minor daughter's medical expenses that were incurred while this case was pending also equitably belong with Ronald in accordance with the temporary order. Ex. WW, XX. Thus, the equity of the award of these medical debts to Ronald is apparent from the facts contained in the record.

{¶35} Ronald was also awarded the debts from the Internal Revenue Service and the State of Ohio that total $29,488.18. These debts were sums that Heather and Ronald owed jointly in personal income taxes. Heather testified that she received $800.00 a week from Ronald to cover living expenses from her family and did not work during their marriage. Thus, she had the benefit of Ronald's income for the duration of the marriage, yet she does not share in the payments that are due on these personal income taxes. The facts in the record do not make the equity of this award apparent. Further, the trial court does not explain why it is equitable for

these joint debts to be the sole responsibility of Ronald. The trial court did not find that Ronald engaged in financial misconduct or that Ronald incurred these debts independently of Heather. In support of its decision to award all of the debts to Ronald, the trial court merely mentions that Ronald has the bulk of the assets, a higher income, and the income generating enterprises. However, this general statement does not clarify the purported equity of these particular awards to Ronald.

{¶36} Additionally, Ronald was given the sole responsibility for Heather's student loans, which amount to $10,800.00. These debts were incurred by Heather alone for the purpose of her personal development. At no point during this marriage was Heather a licensed massage therapist. Further, the record does not present any evidence that she generated income for the household through use of this professional training. By the time of the divorce, she had still not retaken her licensing exam to be a massage therapist and is, therefore, still unable to use this training in a professional capacity. Thus, this training has resulted in her personal development but was not shown at the divorce proceeding to have benefited Ronald or her family in any way. The equity of this award to Ronald is not apparent from the facts in the record. The reasoning of the trial court similarly does not clarify the equity of the decision to award the entirety of this debt to Ronald.

{¶37} After close examination of the record, we find that this unequal distribution of marital debts and assets is not an equitable distribution. The equity of several awards of marital indebtedness—such as the mortgages on the real estate,

the business debts, and the unpaid medical bills—to Ronald is apparent from the facts in the record. However, the equity of awarding of all of Heather's student loan debt and all of Ronald and Heather's joint personal tax liabilities to Ronald is not apparent from the facts in the record. Further, the trial court did not articulate which of its findings made this unequal distribution equitable. In so doing, the trial court abused its discretion. For this reason, Ronald's fifth and sixth assignments of error are sustained.

*Seventh Assignment of Error*

{¶38} In his seventh assignment of error, Ronald asserts that the amount of spousal support ordered by the trial court was excessive. First, Ronald argues that the trial court attributed a level of income to him that does not account for fluctuations in his business. In its order, the trial court based its decision on child and spousal support on the basis of his monthly expenses and gambling expenditures. As stated in his second assignment of error, Ronald asserts that the trial court should have relied on an average of several years of income rather than assuming his personal expenses and gambling expenditures in 2016 were representative of his future income. Second, Ronald argues that the trial court did not properly consider the fact that Heather was voluntarily unemployed as it calculated what it considered to be an appropriate level of spousal support. For these reasons, Ronald argues that the trial court should reverse the award of spousal support and remand this decision to the trial court for further consideration.

Legal Standard

**{¶39}** "Pursuant to R.C. 3105.18, a reasonable amount of spousal support should be awarded when appropriate." *Jordan v. Jordan*, 3d Dist. Hancock No. 5-03-07, 2003-Ohio-7116, ¶ 14. R.C. 3105.18 "directs a trial court to use the factors to determine whether spousal support is 'appropriate and reasonable,' not whether it is 'necessary.'" *Muckensturm v. Muckensturm*, 3d Dist. Hancock No. 5-11-38, 2012-Ohio-3062, ¶ 16, citing *Chaudhry v. Chaudhry*, 9th Dist. No. 15252, 1992 WL 74204, *3 (Apr. 8, 1992). The fourteen factors under R.C. 3105.18 include:

> **(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;**
>
> **(b) The relative earning abilities of the parties;**
>
> **(c) The ages and the physical, mental, and emotional conditions of the parties;**
>
> **(d) The retirement benefits of the parties;**
>
> **(e) The duration of the marriage;**
>
> **(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;**
>
> **(g) The standard of living of the parties established during the marriage;**
>
> **(h) The relative extent of education of the parties;**
>
> **(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;**

**(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;**

**(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;**

**(l) The tax consequences, for each party, of an award of spousal support;**

**(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;**

**(n) Any other factor that the court expressly finds to be relevant and equitable.**

R.C. 3105.18(C)(1). "[O]nce the factors of R.C. 3105.18 have been considered, the amount of spousal support is within the sound discretion of the trial court." *Jordan* at ¶ 14, citing *Young v. Young*, 9th Dist. Lorain No. 93CA005554, 1993 WL 548765 (Dec. 29, 1993).

{¶40} Trial courts are given broad discretion in determinations involving spousal support. *Muckensturm* at ¶ 16. For this reason, the decisions of a trial court regarding spousal support will not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion is more than an error of judgment; rather, it implies that the trial court's decision was unreasonable, arbitrary, or capricious." *Schroeder, supra,* at ¶ 7, quoting *Heilman, supra,* at ¶ 14. "When applying the abuse of discretion

standard of review, this court is not free merely to substitute its judgment for that of the trial court." *Kreitzer, supra*, at ¶ 16.

Legal Analysis

**{¶41}** In this case, the trial court considered the statutory factors in R.C. 3105.18(C)(1) and determined that spousal support was appropriate. Doc. 99, 134. The trial court determined that Ronald should pay $2,000.00 a month in spousal support. Doc. 99, 134. However, until their minor child reached the age of majority in June of 2017, this amount was reduced to $1700.00 per month to account for the $300.00 of child support that Heather was ordered to give to Ronald to provide for their minor child each month. Doc. 99, 134. Beginning in July of 2017, Ronald was ordered to pay Heather $2,000.00 per month in spousal support for sixty months. Doc. 99, 134.

**{¶42}** During her testimony, Heather stated that her personal monthly expenses were $2,025.00 a month, which amounts to an annual total of $24,300.00. Doc. 99. Tr. 35-40. The trial court determined that she was voluntarily unemployed since she quit her job at Roki. Consequently, the trial court had to determine her potential income. After examining her skill set and work experience, the trial court concluded that Heather could earn $9.00 an hour. Thus, the trial court imputed an income to her of roughly $1,560.00 a month or $18,720.00 per year. The trial court stated that it used this figure in the process of computing child support and spousal

support. However, the facts in the record do not make the appropriateness or reasonableness of this level of spousal support apparent for several reasons.

{¶43} First, this level of spousal support covers nearly all of her expenses in spite of the fact that Ronald was awarded large amounts of debt and is not sure his business can remain profitable. In the divorce decree, Ronald was given responsibility for $736,028.22 of debts that were incurred during the course of the marriage. He also testified that he believes his business has a negative equity of $20,000.00 and that he is not sure how profitable his company will be in the future. The trial court ordered Ronald to pay Heather $2,000.00 per month in spousal support. This figure is only $25.00 short of covering all of her monthly personal expenses in their entirety. Thus, this trial court order makes Ronald responsible for both of their past debts, as well as for both of their personal living expenses for the next five years. Second, while the trial court emphasizes the fact that Heather is struggling to pay her bills, the trial court does not seem to account for how she contributed to her present financial condition. The trial court found that Heather was voluntarily unemployed, having chosen to quit her job at Roki. This job paid $16.82 an hour, which amounts to almost $35,000.00 a year in income. This income was more than adequate to cover her personal living expenses. At the time of the divorce proceeding, Heather was struggling to pay her bills because she chose not to keep her job. The trial court does not explain why Ronald should have to pay a

level of spousal support that covers almost all of her personal living expenses while she, at the time of the divorce proceeding, was not contributing to her own support.

{¶44} Third, while the trial court mentions the imputed income in its spousal support analysis, the trial court's decision on spousal support does not seem to account for the potential income that was imputed to Heather. The trial court determined that Heather's annual imputed income was $18,720.00 and that she had earned twenty percent of this total by the time of the divorce proceeding. Since her annual spousal support is $24,000.00, she is expected to make $42,720.00 under this arrangement. By comparison, in her testimony, Heather testified that Ronald gave her $800.00 per week for the last fifteen years of their marriage to cover the living expenses for their family. A weekly sum of $800.00 a week gives her $41,600.00 per year to cover the expenses of four people. Under the trial court order, she is given more provision than this to cover the living expenses of one person.

{¶45} The decision of the trial court to give Heather $2,000.00 a month is incongruous with the facts contained in the record. The trial court's decision does not clarify the rationale for this level of spousal support given the larger context of the facts of this case. Thus, the trial court's decision is not properly supported by the record and amounts to an abuse of discretion. The trial court should reconsider this issue and clarify its determination. For these reasons, Ronald's seventh assignment of error is sustained.

*Third Assignment of Error*

**{¶46}** In his third assignment of error, Ronald argues that the trial court erred by failing to use the amount that Heather was earning at Roki as the level of income Heather was capable of earning. She earned $16.82 an hour at Roki before voluntarily leaving her place of employment. Tr. 28-29. However, the trial court computed spousal support on the assumption that Heather, with her level of training and experience, was capable of earning only $9.00 an hour. In so doing, Ronald asserts that the trial court used an inappropriate level of income in determining Heather's child support obligation and abused its discretion.

Legal Standard

**{¶47}** We herein reincorporate the legal standard set forth under the second assignment of error, which addressed the calculation of Ronald's income.

Legal Analysis

**{¶48}** In this case, the magistrate determined that Heather was voluntarily unemployed since she chose to quit her job at Roki. Tr. 28-29. Consequently, the magistrate proceeded to determine her potential income under R.C. 3119.01(C)(11). The magistrate examined Heather's employment experience. Heather had worked for Siferd Plumbing, performing basic administrative functions and overseeing scheduling for the business. More recently, Heather had worked as a laborer and as a cashier. As a cashier, she earned $9.00 an hour at Gordon Food Service. Tr. 30. While she made $12.00 an hour at Best Buy, the magistrate noted that this was a

temporary position. Tr. 30. The magistrate also mentioned that the job at Roki, which paid $16.82 an hour, did not develop her skill set in a way that would increase her earning potential. Tr. 28-29.

**{¶49}** The magistrate then considered the fact that Heather's training is limited to massage therapy. Doc. 99. However, the magistrate noted that Heather was not yet licensed as a massage therapist and could not, therefore, obtain a job on the basis of this training. Doc. 99. After considering all of the relevant statutory factors, the magistrate determined that Heather's potential income was $9.00 an hour. Doc. 99. In reaching this conclusion as to her potential income, the trial court based its decision on evidence in the record. We do not find evidence in the record that would demonstrate that the trial court abused its discretion in making this particular determination.

**{¶50}** However, the trial court, in determining the appropriate level of child support for Heather to pay, considered the amount of spousal support that Ronald was ordered to pay to Heather in accordance with R.C. 3119.01(C)(7). Since the trial court ordered Ronald to pay $2,000.00 per month in spousal support and imputed an annual income to Heather of $18,720.00, Heather's income, for the purposes of child support, was $42,720.00. As part of our resolution of the seventh assignment of error, we ordered the trial court to reconsider the amount of spousal support. After the trial court reevaluates its decision on the appropriate level of spousal support, Heather's gross income may be different from the $42,720.00 that

the trial court used to determine an appropriate level of child support. While we do not find that the trial court erred in determining Heather had a potential annual income of roughly $18,720.00, we do find that the trial court will need to reconsider the issue of an appropriate level of child support due to our decision in the seventh assignment of error. For this reason, Ronald's third assignment of error is sustained.

*Fourth Assignment of Error*

{¶51} In his fourth assignment of error, Ronald points to the child support order and challenges the trial court's decision to deviate the amount of Heather's child support away from the statutory schedule. The statutory schedule showed that Heather should pay $389.50 per month in child support. However, in the final order, the amount of Heather's child support obligation was reduced to $300.00 per month. Ronald argues that the reason given to deviate the amount of child support in Heather's favor was not supported by the evidence before the magistrate. For this reason, Ronald contends that the trial court erred by failing to comply with the requirements of R.C. 3119.24 and should, therefore, be reversed.

Legal Standard

{¶52} R.C. 3119.24, which governs the award of child support when the trial court issues a shared parenting order, reads, in its relevant part, as follows:

> **A court that issues a shared parenting order in accordance with section 3109.04 of the Revised Code shall order an amount of child support to be paid under the child support order that is calculated in accordance with the schedule and with the worksheet set forth in section 3119.022 of the Revised Code, through the line**

> **establishing the actual annual obligation, except that, if that amount would be unjust or inappropriate to the children or either parent and would not be in the best interest of the child because of the extraordinary circumstances of the parents or because of any other factors or criteria set forth in section 3119.23 of the Revised Code, the court may deviate from that amount.**

R.C. 3119.24(A)(1). R.C. 3119.022 contains a worksheet in which the trial court must enter the income of the parents as the basis for the child support calculation. R.C. 3119.022. R.C. 3119.24(A)(2) gives the trial court the discretion to deviate from the level of child support prescribed by the statutory schedule if such a deviation is appropriate under the facts of that particular case. R.C. 3119.23(A)(2). R.C. 3119.24(B) outlines the factors to consider in the process of determining whether a deviation from the statutory schedule is appropriate. R.C. 3119.24 reads, in its relevant part, as follows:

> **(A)(2) The court shall consider extraordinary circumstances and other factors or criteria if it deviates from the amount described in division (A)(1) of this section and shall enter in the journal the amount described in division (A)(1) of this section its determination that the amount would be unjust or inappropriate and would not be in the best interest of the child, and findings of fact supporting its determination.**
>
> **(B) For the purposes of this section, "extraordinary circumstances of the parents" includes all of the following:**
>
> **(1) The amount of time the children spend with each parent;**
>
> **(2) The ability of each parent to maintain adequate housing for the children;**

**(3) Each parent's expenses, including child care expenses, school tuition, medical expenses, dental expenses, and any other expenses the court considers relevant;**

**(4) Any other circumstances the court considers relevant.**

R.C. 3119.24(A)(2), (B).

{¶53} "There is a 'rebuttable presumption' that the amount of child support calculated pursuant to the basic child support schedule and applicable worksheet is the correct amount of child support due. R.C. 3119.03." *Warner v. Warner*, 3d Dist. Union No. 14-03-10, 2003-Ohio-5132, ¶ 15.

**If a court does find that a deviation is appropriate under the statutory factors, it must include three items in the journal entry: (1) the amount of child support calculated pursuant to the schedule and worksheet through the line establishing the actual annual obligation; (2) its determination that the presumed amount would be unjust or inappropriate and would not be in the best interests of the child; and (3) findings of fact supporting that determination. Court-ordered deviations from the schedule and worksheet are not permitted absent full and strict compliance with the statutory requirements.**

(Citations omitted.) *Green v. Tarkington*, 3d Dist. Mercer No. 10-10-02, 2010-Ohio-2165, ¶ 20.

{¶54} "An appellate court reviews child support issues under an abuse of discretion standard." *Bonvillian v. Clark*, 3d Dist. Mercer No. 10-13-20, 2014-Ohio-2003, ¶ 11, quoting *Borer v. Borer*, 3d Dist. Seneca No. 13-06-38, 2007-Ohio-3341, ¶ 8. "An abuse of discretion is more than an error of judgment; rather, it implies that the trial court's decision was unreasonable, arbitrary, or capricious."

*Schroeder, supra,* at ¶ 7, quoting *Heilman, supra*, at ¶ 14. "When applying the abuse of discretion standard of review, this court is not free merely to substitute its judgment for that of the trial court." *Kreitzer, supra,* at ¶ 16.

Legal Analysis

**{¶55}** In this case, the trial court ordered a shared parenting plan and determined that Heather should provide a level of support for her minor child. The statutory schedule showed that Heather, at the income level calculated by the trial court, should have a child support obligation of $389.50 per month. The trial court determined that a deviation from the statutory schedule was appropriate and set Heather's child support obligation at $300.00 per month.[4] However, we need not reach the issue of whether such a deviation was appropriate or whether the trial court followed the appropriate process for ordering such a deviation because the resolution of Ronald's seventh assignment of error requires reconsideration of the issues surrounding the fourth assignment of error.

**{¶56}** In calculating the amount of child support, the trial court recorded Heather's annual income in the worksheet as $42,720.00. This annual income includes $24,000.00 per year in spousal support, which is based upon Ronald's spousal support level of $2,000.00 a month. In the seventh assignment of error, we reversed the trial court's determination as to the amount of spousal support that

---

[4] This sum was subtracted from the amount of spousal support that Ronald was ordered to pay Heather each month. Thus, Ronald's spousal support payment was reduced from $2,000.00 per month to $1,700.00 per month until their minor child reached the age of majority in June of 2017. Doc. 99, 134.

Ronald was ordered to pay Heather. Since the trial court must reconfigure the amount of spousal support that Ronald is obligated to pay Heather, her annual income will be altered, changing the trial court's calculus for determining Heather's child support obligation. Since the trial court's determination in this matter rests upon the level of spousal support Ronald was given, the trial court must reconsider the child support and any appropriate deviation after it reconsiders Ronald's spousal support obligation and reevaluates Heather's annual income for child support purposes to account for the different level of spousal support that she will be receiving. For these reasons, Ronald's fourth assignment of error is sustained.

*Eighth Assignment of Error*

{¶57} In his eighth assignment of error, Ronald argues that a provision in interim order violated the Ohio Civil Rules of Procedure. Civ.R. 53(D)(4)(e)(ii) prohibits an interim order from lasting more than twenty-eight days from its date of entry. Civ.R. 53(D)(4)(e)(ii). However, Civ.R. 53(D)(4)(e)(ii) allows a trial court to extend an interim order in twenty-eight day increments upon a showing of good cause. *Id*. The provision Ronald identifies in his appeal states that the interim order would be automatically extended upon its expiration regardless of whether a motion was filed that showed good cause for renewing the motion upon its expiration. Doc. 113. On the basis of this argument, Ronald requests that trial court be reversed as to this issue.

Legal Standard

{¶58} Under Civ.R. 53(D)(4)(e), "[a] court that adopts, rejects, or modifies a magistrate's decision shall also enter a judgment or interim order." Civ.R. 53(D)(4) If the court enters an interim order, Civ.R. 53(D)(4)(e)(ii), in its relevant part, provides:

> **The timely filing of objections does not stay the execution of an interim order, but an interim order shall not extend more than twenty-eight days from the date of entry, subject to extension by the court in increments of twenty-eight additional days for good cause shown.**

Civ.R. 53(D)(4)(e)(ii). "[I]n civil as well as criminal cases, [the] failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099, 1103 (1997).

Legal Analysis

{¶59} In this case, Heather filed a motion that requested an interim order on June 27, 2016. Doc. 109. In response, the trial court issued an interim order on July 8, 2016. Doc. 113. In response to the interim order, Ronald, on July 29, 2016, did file a motion that contained several arguments for why the trial court should vacate the interim order. Doc. 118. None of these arguments contained an objection to the provision that automatically renewed the interim order. Doc. 118. Further, Heather submitted motions to renew the interim order prior to the expiration of every twenty-eight-day period in between the issuance of the interim order and the entry of the

divorce decree. Altogether, she filed four motions for the renewal of the interim order. Doc. 117, 121, 123, 124.

**{¶60}** On August 9, 2016, Ronald filed an objection to Heather's first motion to renew the interim order on the grounds that his motion to vacate the original interim order was still before the court but did not object to the provision of the interim order that provided for its automatic renewal. Doc. 120. Similarly, Ronald gave no objection to Heather's three subsequent motions to renew the interim order. Further, no other document in the record contains an objection to the provision in the interim order that Ronald identifies on appeal as being contrary to Civ.R. 53(D)(4)(e)(ii). Since Ronald did not object to this issue below, this issue was not preserved for consideration on appeal.

**{¶61}** Further, the fact that the trial court's decision to issue an order that automatically renewed shows that the trial court intended the interim order to remain in place until the divorce was finalized and suggests that that the trial court would have renewed the interim order had Ronald brought the issue of automatic renewal to the trial court's attention. Heather also filed a motion to renew the interim order prior to the expiration of every twenty-eight-day period in between the issuance of the interim order and the entry of the divorce decree. These facts strongly suggest that, if the trial court erred in this matter, it was harmless error. For these reasons, Ronald's eighth assignment of error is overruled.

*Conclusion*

**{¶62}** Having found no error prejudicial to the appellant in the particulars assigned and argued in the second and eighth assignments of error, the judgment of the Domestic Relations Division of the Court of Common Pleas of Hancock County is affirmed as to these issues. Having found error prejudicial to the appellant in the third, fourth, fifth, sixth, and seventh assignments of error, the judgment of the Domestic Relations Division of the Court of Common Pleas of Hancock County is reversed as to these issues. This matter is remanded to the trial court for further proceedings in accord with this opinion.

*Judgment Affirmed in Part*
*Reversed in Part*
*And Cause Remanded*

**PRESTON, P.J. and SHAW, J., concur.**

**/hls**